O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JILLIAN HALLMAN,<br><br>               Plaintiff,<br>    v.<br><br>ABERCROMBIE & FITCH STORES, INC.; STEPHANIE CHARLES; MEGHAN WATUMULL; and DOES 1–25, inclusive,<br><br>               Defendants. | Case No. 2:13-cv-02139-ODW(SSx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [28]** |

## I.  INTRODUCTION

Plaintiff Jillian Hallman alleges that she suffered a barrage of racial discrimination, harassment, and retaliation while employed with Defendant Abercrombie & Fitch Stores, Inc. She asserts that her district manager, Defendant Stephanie Charles, made a racially motivated comment about Hallman's hair and exhibited African-American stereotypes when speaking with Hallman about an alleged incident with a coworker. But the evidence presented reveals that Abercrombie did not terminate Hallman's employment or otherwise retaliate against Hallman because of her race or her complaint to human resources; rather, Abercrombie terminated her employment because she failed to return from medical leave. The Court therefore finds that Hallman has not established any actionable claims and **GRANTS** Defendants' Motion for Summary Judgment.

## II. FACTUAL BACKGROUND

In July 2010, Abercrombie hired Hallman as a manager in training at Abercrombie's Northridge, California store. (Statement of Undisputed Facts ("SUF") 8.) At the time Hallman joined Abercrombie, her district manager was Shamika Marsh. (SUF 15.) In April 2011, Charles took over as district manager. (SUF 17.) Defendant Meghan Watumull served as the Northridge store's regional manager during Hallman's tenure at Abercrombie. (SUF 20.)

On October 8, 2010, Marsh issued Hallman a "Poor Performance Note" for failing to take breaks during her shift. (Hallman Dep. Ex. 7 ("Jillian Hallman had 3 violations within [*sic*] 9/4/2010. Jillian needs to understand the importance of taking breaks.").) Around October 24, 2010, Abercrombie promoted Hallman to Assistant Manager of the Northridge store. (SUF 12.) Hallman's position required her to understand, adhere to, and enforce the store's break policies. (SUF 28.)

Thereafter, Hallman used the store's telephone to contact Human Resources to inquire "what happens if there are things going on that just prevent you from taking your break." (Hallman Dep. 89:24–90:2.) Hallman "didn't give [her] name either time [she] called" HR. (*Id.* 93:11–14.) Neither did she provide her store number. (*Id.* 93:16–17.) An individual from HR informed Marsh about Hallman's call. (Marsh Decl. ¶ 5.) In April 2011, Marsh informed Charles that Hallman had complained to HR about not receiving proper breaks. (Charles Dep. 67:3–18.)

During her deposition, Hallman admitted that her discrimination and harassment claims were confined to five incidents. (Hallman Dep. 240:5–242:7.) The first incident arose during the early months of 2011 when Northridge store managers were reviewing photographs of individuals who had the "look" Abercrombie sought to recruit. (*Id.* 58:1–59:2.) Cornelius Harrell, the Northridge store manager, pointed to a photograph of an African-American woman with "big curly hair" and said "we're looking to recruit people . . . with hair not like Jillian's [Plaintiff's]." (*Id.* 58:17–59:2.) Charles then remarked, "Yeah, we're looking for people who have curly hair."

(*Id.* 59:12–16.) Hallman "was wearing [her] hair straightened" at the time. (*Id.* 60:1–2.)

The second incident occurred when Charles arrived at the store and started talking to Hallman about clothes not being folded properly in the front of the store. (Hallman Dep. 56:2–15.) Charles did not say anything related to race during that encounter, nor does Hallman believe that that incident was in any way racially related. (*Id.* 56:20–23; 57:4–6; 57:18–25.)

Next, Charles disciplined Hallman for having a hostile conversation with another employee. (*Id.* 132:23–134:3.) Charles said, "Girl, you put Noah [the other associate] on blast." (*Id.* 133:4–5.) Hallman contends that when Charles made this comment she used a "stereotypical African-American hand gesture," that is, she "waved her hand around and shook her neck while she spoke, depicting the movements of a stereotyped black female." (Additional Material Facts ("AMF") 20.) Charles did not say anything about Hallman's race on this occasion. (Hallman Dep. 129:20–25.)

The fourth incident involved the start time of two of Hallman's shifts being changed. (SUF 67.)[1] Abercrombie's home office issues a mandatory schedule each week. (SUF 68.) Hallman twice requested shift start times that ran contrary to mandatory schedule. (SUF 75.) These times were then changed to conform to the weekly schedule. (*Id.*) It is unclear who made these changes. Hallman texted Charles regarding these changes, and Charles told her to follow the mandatory schedule. (SUF 76–77.) Charles did not change Hallman's schedule. (Charles Dep. 141:7–10.)

On August 1, 2011, Hallman's doctor faxed the Northridge store a note indicating that Hallman should be relieved of her duties "due to severe stress." (SUF 83.) Abercrombie placed Hallman on leave the next day. (SUF 85.)

---

[1] Hallman raises a litany of objections to this and other facts in Defendants' Statement of Undisputed Facts. Most of these cut-and-paste objections simply repeat each other and do not reference any Federal Rule of Evidence or other legal exclusionary rule. To the extent relevant to this factual statement, Hallman's objections are overruled. (*See* ECF No. 25, at 7:16–17.)

1 Abercrombie's leave policy provides that employees are entitled to the leave
2 permitted under the Family and Medical Leave Act ("FMLA"). (SUF 86.) If an
3 employee does not return by the end of that period, Abercrombie may terminate her
4 employment. (*Id.*)

5 In her leave paperwork, Hallman claimed "depression due to feeling targeted at
6 work because of her race." (SUF 104.) An HR representative then began
7 investigating Hallman's racial-harassment claim. (SUF 105.) The representative
8 attempted to contact Hallman on multiple occasions. (Hunt Decl. ¶ 5.) But Hallman
9 never returned her calls. (*Id.*)

10 On November 7, 2011, Abercrombie sent Hallman a letter stating, "You are
11 either required to return to work as of October 24th or provide us with a Dr. note
12 stating that you are not able to return. If we do not hear from you by Monday,
13 November 14th we will terminate your employment with Abercrombie & Fitch as of
14 November 14th, 2011." (Hallman Dep. Ex. 27.) Hallman did not return to work by
15 that date. (SUF 109.) Abercrombie then terminated Hallman's employment. (SUF
16 110.) Two weeks later on November 29, 2011, Hallman's doctor called
17 Abercrombie's claims administrator and stated that Hallman was "severely disabled."
18 (Cantor Decl. Ex. 23.)

19 The fifth incident involved Charles requesting that Hallman turn in her store
20 keys while on leave so that Charles could give the keys to the assistant manager
21 covering for Hallman. (SUF 80.) Hallman texted Charles on August 12, 2011, to
22 inquire why Charles needed the keys back. (Hallman Dep. Ex. 9.) Charles replied
23 that the Northridge store had four managers but only two sets of keys. (*Id.*)

24 Between July 11, 2011, and August 16, 2011, Charles issued Hallman five Poor
25 Performance Notes for not completing morning preparation, not securing extra
26 clothing-sensor guns, using poor judgment in receiving a write-up from Charles, being
27 dishonest about the time she installed visual marketing in the store, and receiving a
28 / / /

written customer complaint about Hallman's alleged rude service. (Cantor Decl. Ex. 14.)

On July 16, 2012, Hallman filed suit against Abercrombie, Charles, and Watumull in Los Angeles County Superior Court, alleging claims under the California Fair Employment and Housing Act ("FEHA") for racial discrimination, racial harassment, retaliation for reporting harassment and discrimination, failure to prevent discrimination and harassment, and retaliation for engaging in protected activity; common-law claims for wrongful termination and intentional and negligent infliction of emotional distress; and retaliation under the FMLA. (ECF No. 1, Ex. 1.) Defendants then removed the case to this Court. (ECF No. 1.) On July 29, 2013, Defendants moved for summary judgment. (ECF No. 28.) Hallman timely opposed. (ECF No. 31.) On September 23, 2013, the Court held a hearing on the Motion and took the matter under submission. That Motion is now before the Court for decision.

### III.  LEGAL STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine issue for trial. *Id.*; Fed. R. Civ. P. 56(c). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

A genuine issue of material fact must be more than a scintilla of evidence or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## IV. DISCUSSION

Hallman brings several discrimination, harassment, retaliation, and common-law claims, mostly stemming from her termination from Abercrombie. But Defendants have established that Hallman's termination resulted from her failure to return from FMLA leave—not from retaliation for Hallman reporting any alleged discrimination or other FEHA violations. The Court thus grants Defendants' Motion on all claims.

### A. Racial discrimination

Hallman asserts that Defendants discriminated against her due to her race by disciplining her, changing her shift-start times, and ultimately terminating her employment.

California's FEHA provides that it is an unlawful employment practice for an employer to "discriminate against [a] person in compensation or in terms, conditions, or privileges of employment" because of race. Cal. Gov't Code § 12940(a). The California Supreme Court has adopted a three-step burden-shifting analysis for racial-discrimination claims. First, the plaintiff must adduce evidence that (1) she is a member of a protected class, (2) she was qualified for the position she held, (3) she suffered an adverse employment action, and (4) "some other circumstance suggests discriminatory motive." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000). If the plaintiff establishes these four elements, a presumption of discrimination arises. *Id.*

The burden then shifts to the employer to rebut the presumption through admissible evidence of a "legitimate, nondiscriminatory" reason for the adverse employment action. *Id.* at 355–56. If the employer sustains this burden, the

1 presumption disappears. *Id.* at 356. The plaintiff then has "the opportunity to attack
2 the employer's proffered reasons as pretexts for discrimination, or to offer any other
3 evidence of discriminatory motive." *Id.*

4       Hallman asserts that she satisfied her burden of establishing a prima facie case
5 of race discrimination. She is an African-American woman, and no one disputes that
6 she was qualified for her managerial position at Abercrombie. She argues that she
7 suffered unjustified discipline and was terminated while on FMLA leave because of
8 her race. Hallman also points to the changes to her schedule that she alleges that
9 Charles made.

10       But Abercrombie contends that it terminated Hallman's employment only
11 because she failed to return from FMLA leave within the 12-week period allowed by
12 statute and company policy. Charles also argues that she played no role in the
13 termination decision, so Charles's alleged beliefs about Hallman are irrelevant to the
14 discrimination inquiry.

15       There is no dispute that Hallman has established the first three elements of her
16 prima facie case. The dispute focuses on the last element, that is, whether
17 Abercrombie exhibited any discriminatory motive in disciplining Hallman and
18 terminating her employment. California case law requires "very little" direct evidence
19 of an employer's discriminatory motive. *Morgan v. Regents of Univ. of Cal.*, 88 Cal.
20 App. 4th 52, 69 (Ct. App. 2000). But that does not mean that the plaintiff need not
21 adduce any evidence on the motive issue.

22       It is undisputed that Abercrombie granted Hallman a full 12 weeks of leave in
23 accordance with the FMLA and Abercrombie's own leave policy. In fact,
24 Abercrombie even gave Hallman an additional three weeks of leave before it
25 terminated her employment. Hallman's leave—at least initially—had nothing to do
26 with race. Hallman's doctor faxed a note to Abercrombie indicating that Hallman
27 needed to be relieved of her duties due to stress, and Abercrombie promptly complied.
28 Hallman did indicate in later paperwork that her perceived racial discrimination

contributed to her stress. Abercrombie's HR department then attempted to investigate Hallman's complaint—not discriminate against her. Yet Hallman never returned the HR representative's calls. So even if Hallman could establish that Defendants exhibited a discriminatory motive—a matter far from established—Defendants have rebutted the prima facie case through its legitimate, nondiscriminatory motive, i.e., Hallman's failure to return from FMLA leave.

Neither has Hallman adduced any evidence of racial discrimination to rebut this legitimate, nondiscriminatory motive. The only incidents that one could construe as racially related are Charles's alleged comments that Abercrombie sought to recruit people with curly hair and that Hallman put an associate "on blast." While perhaps unkind to Hallman, nothing came of these comments. Abercrombie took no "adverse employment action" as a result of these allegedly racial comments—a requirement for establishing racial discrimination. *Guz*, 24 Cal. 4th at 355. Rather, Abercrombie validly terminated Hallman's employment when she failed to return after some 15 weeks of leave. Without any consequences stemming from Charles's comments, Hallman could not—and did not—establish racial discrimination.

Hallman also has not adduced any evidence to establish that Charles or Watumull played any role in Abercrombie's termination decision. That decision came from the company's home office in Ohio.

The Court thus finds that Hallman has not established her racial-discrimination claim and accordingly **GRANTS** Defendants' Motion on this ground.

**B.    Racial harassment**

Hallman also argues that Abercrombie subjected her to racial harassment. FEHA prohibits an employer from harassing any employee because of race. Cal. Gov't Code § 12940(j)(1). To establish racial harassment, Hallman must show that (1) she is a member of a protected class, (2) she was subjected to "unwelcome racial harassment," (3) the harassment was based on race, (4) "the harassment unreasonably interfered with [her] work performance by creating an intimidating, hostile, or

offensive work environment," and (5) Abercrombie is liable for the harassment. *Thompson v. City of Monrovia*, 186 Cal. App. 4th 860, 876 (Ct. App. 2010).

A reasonable-person standard governs whether the harassment created a hostile work environment. *Id.* at 877; *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 264 (Ct. App. 2009). Courts consider the frequency of the racial conduct, the severity of the racial conduct, whether the racial conduct was physically threatening or humiliating or "a mere offensive utterance," and whether the racial harassment unreasonably interfered with the plaintiff's performance of her duties. *Etter v. Veriflo Corp.*, 67 Cal. App. 4th 457, 467 (Ct. App. 1998).

Hallman initially contended that the five incidents described in the factual background constituted a racially hostile work environment. She argued that Abercrombie's management singled her out and told her that they were looking for recruits with hair different than hers. Hallman also asserts that when Charles disciplined Hallman for having a hostile conversation with another employee, Charles allegedly used "stereotypical African-American hand gestures" and a "stereotypical slang phrase," that is, that Hallman put the employee "on blast." But at the summary-judgment hearing, Hallman's attorney admitted that the incidents she enumerated did not rise to the level of racial harassment.

Defendants point out that Hallman admits that she has no evidence that any of the five incidents she complains of were racially related. As for the hair comment, Charles argues that she was making sure everyone at the meeting understood the "Abercrombie look." Further, Defendants assert that the five incidents, taken together, do not rise to the level of a hostile work environment.

Three of the incidents to which Hallman refers in her deposition have nothing to do with race. No reasonable jury could find that Charles chastising Hallman for not properly folding clothes in the store, changing the start time of Hallman's shifts, and asking for Hallman's keys back while she was on leave so someone else could cover Hallman's shifts rose to the level of a racially hostile work environment. Hallman

herself admitted this much in her deposition. All of these actions constituted regular managerial actions with concerns firmly rooted far apart from Hallman's race.

Hallman also has not demonstrated why she believes that Charles's comment about Abercrombie wanting to recruit people with curly hair constituted racial harassment. It was Harrell, a nondefendant—not Charles—that said that Abercrombie was looking for recruits with hair different than the style Hallman was then wearing, i.e., straight. Charles only clarified that the store sought new associates with curly hair. No one mentioned anything about Hallman or prospective associates' race during this meeting.

And even if the comment about Hallman's hair could constitute harassment—a rather doubtful point—to sustain a FEHA harassment claim, the acts of harassment alleged by a plaintiff must be "sufficiently severe and pervasive" and not merely "occasional, isolated, sporadic, or trivial." *Etter*, 67 Cal. App. 4th at 466. One tangential comment about Hallman's hair being straight is by definition "isolated," and when directed to an African American can hardly be considered racial.

Hallman also asserts that Charles exhibited racial stereotypes when she told Hallman that she put an associate "on blast." In her deposition, Hallman described Charles's conduct by stating that Charles had "her head cocked to the side and . . . [her] hand on her hip." (Hallman Dep. 136:24–25.) It was not until Hallman submitted her Statement of Additional Material Facts that she injected the notion of several racial stereotypes allegedly being involved. In fact, Hallman admitted that Charles did not reference Hallman's race on this occasion. (*Id.* at 129:20–25.) It is therefore far from clear that Charles's actions were racially related. So by that argument, this vague incident could not be classified as "severe" sufficient to establish Hallman's racial-harassment claim.

Taking the ambiguous comment about Hallman's hair together with Charles's "on blast" comment, Hallman has not surmounted the hurdle to "severe or pervasive" harassment; rather, she falls on the "occasional, isolated, sporadic, or trivial" side of

the line. *See Etter*, 67 Cal. App. 4th at 466. And even if one considers the two incidents as racially harassing, they are far from the "concerted pattern of harassment of a repeated, routine or a generalized nature" that Hallman must show. *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 610 (Ct. App. 1989).

Further, Hallman admitted in her deposition that Watumull never did anything Hallman perceived as racially discriminatory or harassing. This admission further compels the conclusion that Watumull is not liable for racial harassment.

The Court accordingly finds that Hallman failed to establish an actionable racial-harassment claim and **GRANTS** Defendants' Motion on this ground.

### C. Retaliation for reporting discrimination or harassment

Hallman next argues that Abercrombie retaliated against her for reporting in her FMLA leave paperwork that she experienced stress due to racial harassment.

FEHA proscribes an employer from retaliating against an employee "because the person has opposed any practices forbidden under this part or because the person has filed a complaint." Cal. Gov't Code § 12940(h). Hallman must demonstrate (1) that she engaged in a "protected activity," (2) that Abercrombie subjected her to an adverse employment action, and (3) a causal link between the two. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). The plaintiff may establish the latter element circumstantially, such as through "the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision." *Morgan*, 88 Cal. App. 4th at 69–70.

Defendants assert that there is no evidence to establish that they took any adverse action against Hallman in response to her September 7, 2011 racial-harassment complaint, because Abercrombie did not terminate Hallman until two months later when Hallman failed to return from FMLA leave.

Defendants' argument is persuasive. The FMLA entitled Hallman to take up to 12 weeks of leave——and it is undisputed that Abercrombie gave her three weeks

more than that amount of time. Abercrombie also sent Hallman a letter warning her that it would terminate her employment if she did not return. She never did return, so Abercrombie validly exercised its right to terminate Hallman. Nothing about Hallman's termination suggests that Hallman's racial-harassment complaint motivated Abercrombie. The HR department even tried to investigate the matter. But Hallman never returned the department's calls. Abercrombie's action in terminating Hallman's employment was thus not causally connected to Hallman's complaint.

There is also no indication that Charles or Watumull played any part in processing Hallman's leave. Neither did they take part in the decision to terminate Hallman's employment. Both of those actions occurred with Abercrombie's home office in Ohio—far away from Charles or Watumull's involvement in California.

The Court consequently finds that Defendants did not retaliate against Hallman for reporting her racial-harassment concerns and **GRANTS** Defendants' Motion on this ground.

### D. Failure to prevent discrimination and harassment

Hallman further alleges that Defendants are liable for failure to prevent discrimination and harassment in violation of California Government Code section 12940(k). But "there's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen." *Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (Ct. App. 1998). Since the Court finds that Hallman has not established an actionable discrimination or harassment claim, her failure-to-prevent claim similarly falters. The Court accordingly **GRANTS** Defendants' Motion on this claim.

### E. Retaliation for engaging in protected activity

FEHA prohibits an employer from retaliating against an employee "for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Cal. Lab. Code § 1102.5(c). A plaintiff must first establish a prima facie case of retaliation, that

is, that her employer subjected her to an adverse employment action after engaging in protected activity and a causal connection between the two. *Edgerly v. City of Oakland*, 211 Cal. App. 4th 1191, 1199 (Ct. App. 2012). The employer may then adduce evidence of a legitimate, nondiscriminatory motive. *Id.* At that point, the burden shifts to the plaintiff to rebut the employer's proffered motive as pretext. *Id.*

Hallman asserts that Defendants retaliated against her for complaining about the store allegedly not providing her with required meal and rest breaks. She points out that Marsh issued her a Poor Performance Note for *not* taking her breaks, which Hallman classifies as retaliatory. Hallman also asserts that Charles issued her five Poor Performance Notes in July and August 2011 as retaliation for Hallman's complaint to HR in October 2010.

Defendants point out that Hallman did not contact HR to complain about not receiving breaks until *after* Marsh wrote Hallman up for failing to take breaks.

Marsh is not a defendant in this case. So Hallman's assertion that Marsh was displeased with her for reporting meal-break violations to HR cannot establish an actionable retaliation claim against completely different individuals. And even if Marsh's action somehow could factor into the retaliation analysis, it is undisputed that Marsh issued Hallman a Poor Performance Note for not taking her breaks *before* Hallman contacted HR in October 2010. It would therefore be logically erroneous to construe Marsh's Poor Performance Note as retaliation for Hallman's HR complaint when the write-up preceded the complaint.

Hallman's retaliation claim against Charles similarly suffers from several fatal weaknesses. First, Hallman has not adduced any evidence linking Charles's cognizance of Hallman's October 2010 HR complaint to the five Poor Performance Notes that Charles issued Hallman in July and August 2011. Hallman appears to rely on a fallacious *post hoc ergo propter hoc* style of reasoning, that is, that Charles must have issued the write-ups due to Hallman's complaint simply because the write-ups came later in time. As a matter of logic, this temporal relationship does not establish a

legal connection, i.e., retaliation. It is also rather doubtful that Charles would suddenly retaliate against Hallman for a complaint made nine months before the write-ups when Charles was not even Hallman's district manager at the time of Hallman's complaint. The complaint would have reflected poorly on Marsh, not Charles.

Neither has Hallman attacked the validity of the five Poor Performance Notes that Charles issued to her. Hallman does not contend that the write-ups were not warranted by her apparent deficient performance on those occasions. The notes themselves establish legitimate, nondiscriminatory motives for Charles issuing them, such as not completing morning preparation, not securing extra clothing-sensor guns, using poor judgment in receiving a write-up from Charles, being dishonest about the time she installed visual marketing in the store, and receiving a written customer complaint about Hallman's alleged rude service. Without demonstrating that these notes were not bona fide, they cannot serve as the basis for a retaliation claim.

The Court therefore **GRANTS** Defendants' Motion on this ground.

## F. Wrongful termination and FMLA retaliation

Hallman's wrongful-termination and FMLA retaliation claims find a similar fate. The FMLA entitles eligible employees to take up to 12 workweeks of leave during any 12-month period because of, among others, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.200(a)(4). The FMLA also prohibits an employer from retaliating against any employee for exercising her rights protected by the FMLA. 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).

It is undisputed that Abercrombie processed Hallman's FMLA leave the day after her doctor faxed a note to the Northridge store. While the FMLA only mandated that Abercrombie provide Hallman with 12 weeks of leave—thus ending on October 23, 2011—Abercrombie told Hallman she could return as late as November 14, 2011. Hallman never did return, and there is nothing in the FMLA that prevented Abercrombie from consequently terminating her employment.

Hallman makes much of the fact that Abercrombie's letter to her informed her that she could either return to work or provide a doctor's note stating that she was unable to return. But Hallman did neither of these. The letter stated that she was "required to return to work as of October 24th." She never returned by that date. In fact, Abercrombie gave her an additional three weeks of leave after the October 24, 2011 date before terminating her employment on November 14, 2011. Hallman's doctor also did not contact Abercrombie's claims administrator until November 28, 2011—over one month after Abercrombie's deadline and two weeks after Abercrombie terminated Hallman's employment. Abercrombie lived up to everything it discussed in its letter.

And there was nothing wrongful about that termination. California law recognizes the tort of wrongful termination in violation of public policy. *Stevenson v. Super. Ct.*, 16 Cal. 4th 880, 894 (1997). But Hallman has not established any underlying FEHA, FMLA, or other claim. Abercrombie therefore did not violate any public policy sufficient to support Hallman's wrongful-termination claim.

The Court thus **GRANTS** Defendants' Motion on both of these claims.

### G. Emotional-distress claims

Hallman admits in her Opposition that her emotional-distress claims derive from her other statutory claims. Since all of Hallman's other claims fail, so too do the emotional-distress claims.

Even if Hallman had established an actionable underlying claim, she has not established a triable issue concerning whether Defendants engaged in "extreme and outrageous conduct," that is, conduct that transcends "all bounds of that usually tolerated in a civilized community." *Christensen v. Super. Ct.*, 54 Cal. 3d 868, 903 (1991). The five incidents she points to in her deposition—such as Charles complaining about clothes not being folded properly and asking for keys to be returned—all largely fall within Defendants' legitimate business activity. She could not then establish her intentional-infliction-of-emotional-distress claim.

1 And negligent infliction of emotional distress is simply inapposite. As the California Supreme Court reminded litigants, the "negligent causing of emotional distress is not an independent tort, but the tort of negligence." *Burgess v. Super. Ct.*, 2 Cal. 4th 1064, 1072 (1992). Hallman alleges all intentional acts by Defendants, which therefore belies the requisite negligence necessary to sustain a negligent-infliction-of-emotional-distress claim.

The Court accordingly **GRANTS** Defendants' Motion on these claims.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion for Summary Judgment in its entirety. (ECF No. 28.) A judgment will issue.

**IT IS SO ORDERED.**

September 27, 2013

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**